The next case on the calendar is Torres v. Artus. Good morning. May it please the court, John Romberg for Seton Hall Law School's Center for Social Justice, representing plaintiff appellant Armando Torres. In a moment, my co-counsel, law student Robert Noose, will address Torres' disability-related claims. I will, of course, discuss Torres' free exercise claims. This case turns on a factual dispute. Torres was removed from the Religious Meals Program because he did not pick up some meals from the mess hall. Can I just ask you at the start where your client is incarcerated at this point? Is he no longer at Wendy? Our understanding from a different attorney of his who has spoken to his sister is that he, in fact, has been removed from the RMU. Part of the motion about mootness was our fear that that might happen. And I haven't spoken directly with him, but that is our understanding, is that he has been removed from the RMU. But I guess I'm questioning, is he even in the same facility at this point? But it sounds like you don't know the answer. Right. Our understanding is that, because the RMU is at Wendy, our understanding is that he is at a different facility. And why wouldn't that affect mootness as to the new claims that are being asserted? Well, first of all, damages would not be mooted, so there's no question about mootness. It might on remand affect questions of injunctive relief. But my understanding from talking to his sister about where he was a month ago, I think,  How much time does he have left on his sentence? Do you know? I don't. I don't think he's seeking medical parole, which suggests to me that he's not otherwise getting out any time soon. Okay. But to the extent that these are injunctive claims, he's in a different facility, and you're not disputing that those, it looks like those would not be properly before us at this point? I don't have enough. If, in fact, it were definitively established in the record that he were in a different facility and not subject to the same policies, it would certainly seem appropriate, but I don't have enough factual information to be confident that that's true. Does the record reflect, I'm sorry, had you finished your answer? No. Does the record reflect why, when he was in the RMU and kosher meals would have been brought to him at his bed seven days a week, why he didn't request kosher meals at that time? He, at some point between the events here and the last couple of years, he has sought kosher meals and kosher celebrations during religious holidays, so for several weeks a year, but not every meal. I think that his religious practices may have changed in the interim, but for the period under dispute, he was seeking every meal to be a religious meal, and the fact that it's not disputed he was kicked out of the program because he failed to pick up meals, he says factually that's because his disability meant on occasion he was unable to pick up those meals. Defendants say no, that the reason he didn't pick up the meals was he was defiant or the mess hall was aversive, he didn't feel like eating, and there's clearly, in our opinion, a factual dispute in the record whether his disability, his multiple failed kidney transplants, spontaneous hip fractures, fatigue and nausea on the days following dialysis were the reason he failed to pick up meals, and if there's a dispute of fact in the record, summary judgment was inappropriate. We concede that if, in fact, the record definitively showed that he just didn't feel like eating, that he wouldn't be entitled to any of his claims. Defendants implicitly concede that if he could show that the reason he didn't pick up those meals was because of his disability rather than any willful noncompliance, that his claims would be viable, and there's a factual dispute about which of those versions is true. The legal standard also requires that the defendants demonstrate that their actual contemporaneous motivation had a reasonable relationship to legitimate penological needs under the First Amendment, compelling governmental interest, least restrictive means under ARLUPA, and the disability claims even stronger. Their contemporaneous motivation was, you have not submitted medical documentation to us to prove that you can't pick up those meals, therefore you lose. And they refused to investigate. Why? Because he couldn't submit medical documentation proving that he couldn't pick up those meals. They wouldn't investigate. I think that you should be going, that you have a good reason for not taking your meals in your cell on the days of dialysis treatment, but you don't have a good medical reason on other days, and furthermore, it's important for your health that you get out of your cell and you go to the mess hall to maintain your muscle strength and bone density and so forth. And that's not dispositive of summary judgment for multiple reasons, Your Honor. First, that was a statement from 8 months earlier, while Mr. Torres was rapidly deteriorating. At that point, 8 months, he had not been in the RMU. His spontaneous hip fracture occurred down the line. A statement from 8 months earlier does not resolve his condition 8 months later. Second, as I mentioned, under Sullah Hadeen, the question is what was the actual contemporaneous motivation, not whether they could have relied on that 8-month earlier opinion. There's nothing in the record suggesting that's what actually motivated their decision. And finally, and perhaps most fundamentally, what that statement from 8 months earlier said is, Torres, you've requested a 7-day feed-in-cell order, so every single one of your meals should go to your cell. I don't think that's a good idea because you should generally, exercise is good for you, you should generally go to the mess hall. And he did. The question here is whether, on occasion, when he was unable in rare circumstances, the day following dialysis because of fatigue, nausea, weakness, on those rare occasions when he couldn't go to the mess hall, should he therefore be kicked out of the program? Yeah, the forfeiture seems broader than his misconduct, if you want to characterize it as that. This isn't a question about the legitimacy of his faith. It's a question about his adhering to where he picks up, whether he goes and picks up his meal or gets it in his cell, which is a disconnect from the fact that he practices a faith that requires him to have certain dietary needs. Right? I mean, that's your point, isn't it? Yes. He was not eating anything else. Occasional meals, he was so weak, he didn't eat anything. And the defendants aren't contesting the legitimacy of his interest, of his faith and his interest in those meals. The question is, because he missed an occasional meal, should he be kicked out of the program? And the fact that eight months earlier, with no reliance on that statement, that he shouldn't get every single meal sent to his cell doesn't resolve the question of what happens if he misses an occasional meal because of his disability, without any fault of his, whether he should be kicked out of the program. Well, he's just cantankerous and decides not to go and pick up his meal. It's open to defendants to prove at trial that the mess hall was aversive or he was randomly cantankerous and didn't want to eat. I don't think that's very convincing, but it certainly is not established at summary judgment. The only thing they have is their statement and, in fact, their declaration for the mootness. They said, our policy still is, if you want to be excused from picking up a meal, submit medical documentation proving that you can't pick up a meal. And the existence of this statement from the doctor eight months before, not relied on, not contemporaneous, not up to date, stating you shouldn't get every single meal sent to your cell. Even assuming that that is a legitimate judgment, it doesn't mean that he should be kicked out of the program on the days that he can get there, either that on the rare occasions when he can't get there and he notifies them in advance, send him that particular meal to his cell, or at the very least, don't kick him out of the program. Say, we're not going to send you a meal. Sometimes you'll go hungry. But when you can get to the mess hall, you can eat in compliance with your faith. Good morning, Your Honors. May it please the Court. Robert Noose, Seton Hall University School of Law, Center for Social Justice, also appearing for Mr. Torres. Your Honor, so far as Mr. Torres's claims under Title II of the ADA and Section 504 of the Rehab Act are concerned. I have a preliminary question for you. Yes. Why didn't you move to re-argue the motion when you concluded that there was some legitimacy to his ADA and RLUIPA claims to this Court, as opposed to just submitting the brief and characterizing the motion panel's conclusion as demonstrably misplaced?  That's from page 24 of your brief. Well, Your Honor, I can say that it has been this clinic's experience in the past that the motions panel, when they issue pro bono appointment orders, they are not treated as jurisdictional bars. It dismisses the appeal as to any aspects of his appeal. That's true. And directed the clinic to brief only the First Amendment issue. That's true, Your Honor. But we did formally remove to reinstate those. I can't hear you. I'm sorry, Your Honor. We did move to reinstate those claims when we filed our substantive reply in our response to the motion. And that remains before us. Yes, Your Honor. But, Your Honor, when the merits of the motions panel dismissed those claims, they did so only on the basis that they believed Mr. Tewars' claims were so frivolous as to lack any arguable basis in fact and law. And it's our position that reading the record and reading our briefing demonstrates that the merits panel, I'm sorry, the motions panel decision was untrue. Can you address the, your client didn't object before the magistrate to really any of these claims, but I'm concerned principally now about the Raluppa claim and the ADA claim and how, what we should think about the failure of objection before the magistrate. Certainly, Your Honor. Your Honor, when Mr. Tewars filed his objections to the magistrate's claims, he did invoke the Rehab Act and ADA by name, asking for accommodations as to all programs and services. It wasn't, was that really about this claim as opposed to his other concerns with the library and with other conditions? Well, Your Honor, reading Mr. Tewars' submissions broadly, as this Court does under its precedent, we think it's fair to read that objection to raise the strongest argument it suggests. Because Mr. Tewars used the catch-all language, all services and programs, we think it's fair to say that he meant to object broadly to everything that the magistrate judge decided. And, Your Honor, as you point out, Mr. Tewars also did not invoke the First Amendment by name in his objections, but the motions panel apparently did not consider that to be a mistake or a bar, such as to completely bar this Court from reviewing Mr. Tewars' underlying claim. Very briefly, in my last 10 seconds, I would just like to reiterate that this is purely a factual dispute as to whether Mr. Tewars was, as Your Honor said, cantankerous and averse to the mess hall, or whether he was actually prevented from going there by his pain and fatigue. Thank you very much, Your Honor. Just let me give you more time. She's very kind. Most of the time. Good morning, Your Honors. I'll begin with an update. As of the summer, Mr. Torres was moved to the Five Points Correctional Facility, so that's a completely different facility. Any claims for injunctive relief would therefore be moot. That could be verified publicly just by going on the DOC's website. As to the claims for damages, removing Mr. Torres for failing to comply with the attendance rule was not a First Amendment violation. Mr. Torres concedes that the attendance rule serves a legitimate government purpose and that in certain circumstances, removal would be an appropriate consequence because violating the attendance rule signals an inmate's indifference. His dispute is far narrower, which is that there's – he claims that there's an issue of fact as to whether he articulated a viable medical excuse. And the record shows that there is no such issue of fact, Your Honors. Although Torres is claiming that he was medically unable to attend meals during – in the context of the litigation, there is zero evidence that he raised this excuse contemporaneously with either the skipping of meals or the temporary removal from the religious meals program. Of the numerous defendants that he named, there are only two that could even conceivably have involvement with these events. That would have been Food Service Administrator Kelly Smith and her boss, Susan Schumacher. And from their perspective, having no contemporaneous articulation of excuse, they were perfectly reasonable to simply look at an inmate who is skipping meals, they don't know why, and they could infer that he wasn't – that he was among these inmates who were demonstrating indifference. Two weeks after the removal happens is when he first brings these so-called medical problems to the attention not of the food service staff, but to prison grievance officials. And they quite understandably, lacking medical expertise or institutional knowledge on the ins and outs of the food service program, inquire of the food service administrators. That's the investigation. And the food service administrators say that even though he's articulating a claim of medical excuse, he hasn't substantiated it with any documentation. While Mr. Torres is claiming right now that we should have done a further investigation, perhaps by referring this to medical staff, he ignores the fact that the grievance program is not the vehicle by which to seek medical attention. As the Central Office Review Committee advised Torres, it's on page 98 of the appendix, if he has medical concerns, he always has an opportunity to pursue the sick call process. At any time he wants, he can pursue sick call. So to the extent he's raising this broad-based claim that we violate the First Amendment by not accommodating disabled inmates, the record shows otherwise. In fact, Mr. Torres' own case shows otherwise. On three days per week when we were giving him dialysis, we were not only excusing him from attending meals, but delivering meals for him. The feed and sell order that applied for three days and not the other four represents a medical judgment that on those other four days, he is medically able to attend meals. And if Mr. Torres felt otherwise, he certainly had every opportunity to take that up with medical officials. Now, we don't argue that the denial of the feed and sell order was contemporaneously consulted when he grieved the denial of kosher meals, but it certainly is relevant to the First Amendment claim, because that's what's at issue here. This isn't a medical indifference claim. And for First Amendment purposes, it shows that we are paying attention to inmates' medical needs and Mr. Torres argues that we should go a step further and allow inmates such as himself to be excused from any kind of consequence if, in their own subjective opinion, they don't feel up to attending meals on a particular day, that they can just notify staff and either they won't incur consequences or the meals will be delivered to them. And we agree that while Mr. Torres has articulated a viable religious belief, that religious belief does not entitle him to eat meals on his own terms according to rules that he makes for himself. Why not just feed him? Excuse me, Your Honor? Why not just not feed him? Why take him off the kosher meal plan if you concede that he does keep kosher? Why are his religious convictions impaired and not just his dietary needs impaired? Just don't feed him. If he doesn't go to the mess hall on a day that the doctors say he can go, don't feed him. As Mr. Torres concedes, I believe it's on pages 33 to 34 of the brief, this attendance rule is one of the ways by which we measure, are people still adhering to the kosher diet? And so if — Excuse me. Wait for a second. I talk, then you talk, okay? Yes, Your Honor. That way we understand each other better, much better. Okay? So if he doesn't attend, that somehow is an indication of his not commitment to being kosher? Yes, Your Honor. The department can reasonably infer that if a person has asked for kosher meals and they're no longer picking up those kosher meals, meals that are made specially for them. Well, I understand that you may have a concern with regard to waste, and so therefore you may make an argument that there may be some penalty imposed because of the waste that's involved. But this is a 30-day suspension. And I haven't heard you argue that the suspension is commensurate with the waste that's involved by him not picking up a meal for two or three days. Well, Your Honor, that's not an argument that Torres has made either. He hasn't said that the length of the suspension was excessive. He says he shouldn't have been removed from the program at all. The reason that he was advised to take it up with the prison chaplain is that the way the system works in here — I was an inmate at Wendy Correctional Facility, and I'm a diabetic. And I had a dietary need to have a low-carb diet. And I didn't show up to pick up my meal. Would you take me off the diet? In all likelihood, no, Your Honor. Why? Because in that circumstance, you would have a medical order advising that you need to — Why could you interpret it that I'm just not interested in having a low-carb diet anymore? Because in that case, that would be based not on your own preferences as an inmate, but on a medical judgment that you require those meals, whereas religious beliefs can change based on the preferences of — So not picking up a meal is an indication that you no longer wish to keep kosher, even though — I mean, there's no indication that he picked up a different kind of meal. I mean, I would get it. It would make sense to me if you said to him, look, you're not really — and that's what those other cases are all about, where people are selling their kosher meals or trading their kosher meals for other people's non-kosher meals. But this isn't about the legitimacy or the genuineness of his faith. This is about his failure to attend and somehow his failure to pick up a meal, that there's no indication that he substitutes something else. It somehow undercuts his legitimacy of his faith. Your Honor, the premise of your question is attacking the validity of the attendance rule itself, something that Torres is not doing. I'm not attacking anything. I'm asking you questions representing the State of New York. Yes, Your Honor. Don't characterize what I'm doing. Just answer my question. So, Your Honor, that would bring me to my secondary point, which is qualified immunity. Okay. So even if this Court were to disagree that the State is not acting appropriately by applying its attendance rule as an indicator of sincerity — What I wanted to hear from you was, what is the connection to underappreciating the legitimacy or his commitment to keeping kosher when he doesn't show up to pick up his meal? What's the rationale for that? The rationale for that is that when an inmate has been admitted to the kosher meal program, it means that he has meals made specially for him. Because that inmate has declared, part of my religious scruples call upon me to pick up these meals. And if you're missing those meals — Does it violate his faith to not eat? Does it violate his faith to not eat? Right. To go hungry. That is a question that is better left for Torres, Your Honor, because it's a fact. Is that the State's view? That somehow it's inconsistent with his faith? It would be the State's view, Your Honor, that if an inmate doesn't — Curious view, but in any event — It would be the State's view that if an inmate doesn't pick up meals, that that is an indicator that they don't want those meals. Does the policy tell us how many meals do you have to miss before you're suspended for 30 days? That's not in the record, Your Honor. And the other problem with this case is because of the way it was litigated, we really don't have very much in the record that explains the legitimate peniological reason for a 30-day suspension if you miss meals. The record wasn't developed on that. We would argue, Your Honor, that we don't need to justify the basis behind the attendance rule because Torres himself hasn't put that rule at issue. He's conceding that it serves a legitimate peniological purpose. And as I understand him to be arguing, he's arguing that it's not — we didn't act reasonably related because he had advanced medical excuse where — and if the evidence is showing that he didn't advance medical excuse — Then your argument is we don't have to reach this question, this murky question. That's correct, Your Honor. At the very least, prison administrators acting in the position as the defendants here could have reasonably applied these rules, rules that are not under attack, and determined that a temporary removal whereby he can reapply and easily be readmitted simply by going back to the prison chaplain and confirming, yes, I still want kosher meals, that that is an appropriate consequence. For 30 days, though, right? I mean, if you're suspended, you can't get immediately put back into the kosher meal program, can you? No. You would have to go and you would — 30 days without the meals. Yes, Your Honor. And we don't — we don't dispute that that is a substantial burden on religious rights, but we would say that there's no law saying that that's not a reasonable consequence here for violating the rule, and that's not something that this Court needs to get to, because Tora's argument is not that the length of the suspension that 15 days as opposed to 30 days would be appropriate. The alternative that he's proposing is not a shorter suspension, but no suspension at all, to simply let him get his meals whether or not he attends them. Now, I understand my time is up. If I could very briefly just address the ADA claims and clarify the defendant's position on that. Very briefly. So defendants had made a motion to strike. That motion is before the Court. Because Tora's has moved for this Court to consider the claims, we would no longer argue that they're outside the scope of the appeal. Everything is before the Court. But we would still urge the Court not to take those issues up because of the fact that they're unpreserved. Tora's is arguing that the district court had failed to construe his claims liberally and that, as a consequence, he had raised them all along. However, the fact that he didn't raise that argument in his objection to the report and recommendation signals either that he himself had not understood that he was raising those claims or that he knew and has actively forfeited them. And either way, neither RLUIPA nor the ADA is currently a basis for affirmance. Thank you. Thank you. So three quick points. First, as to preserving the objection in the magistrate's report, at A205, he does not subject, as Mr. Noose explained, about the ADA claims such as to the law library, including the suggesting strongly through the extremely charitable lens proper to a pro se inmate, not an educated inmate, he was objecting about his ADA claims such as to the law library. The district court's resolution of his religious meals claims is what remains is dismissed. So if that's adequate for the district court, then for the charitable lens which Mr. Torres should be his pleading should be viewed, that's, we believe, strong, far more than strong enough to preserve those claims. As to the question of whether he raised the disability claims in his complaint, the fourth claim on page A40 overtly connects disability to religious meals. And that's on A40. The fourth claim of the complaint, it was untimely because it was a few months too late. But in construing when he's making the same arguments about the ADA later in the complaint and the religious meals and weaving together what is not a very cogently drafted complaint, the fourth claim puts together those claims and also cites to the grievance on page A83 to A84 in which he overtly says, I want accommodation for my disabilities and in particular including I want to be fed in cell for the days after I get dialysis because I'm lightheaded and nauseous at times, particularly if I have complications, other complications from dialysis. So he was plainly intending to raise the ADA and reasonable accommodation to his religious meals, again, for the fourth claim which was time barred, but reading the rest of his complaint, he was intending to raise those claims. And then the final point that Mr. Hitzous is making is that he made no contemporaneous excuse. He didn't say it comes as a complete surprise that the reason he didn't pick up the meals was his medical problems. But first, in fact, his grievance on A83 and A84 from several months earlier was he was making a disability-related claim. And in fact, it is appropriate through the grievance process to say you suspended me from religious meals. I can't get them because I didn't pick up some meals. I would like to be reinstated to the program. He was fighting that at least through July. So for those several months, could he have gone to the Jewish chaplain and found that he was genuine in his beliefs? Absolutely. But the mechanism he was using to say the reason you've kicked me out of the program is I can't pick up those meals because I'm disabled, and they refused to investigate. They knew full well the reason why he was failing to pick up those meals. They knew months before. We believe that a fair inference reading the record in its best possible light is they knew at the time. They certainly knew when he filed the grievance and through July, when it was finally resolved, they said you do not have medical documentation proving you can't pick up those meals. That's why we're denying you. Thank you. Your Honor, very, very briefly, I would just like to urge the court to reach the disability claims because they are plainly non-frivolous and are animated solely by a question of fact. That's not established either way as a matter of law by the record. Thank you very much. Thank you all.  Thank you. Thank you all for Seaton Hall's help in this matter. It's much appreciated. Thanks very much. Nicely done.